UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JOHN H. RING, III, CHAPTER 7 TRUSTEE,

    Plaintiff-Appellant,

v.

TED'S JUMBO RED HOTS, INC.,

    Defendant-Appellee.

**DECISION AND ORDER**

21-CV-957S

## I. INTRODUCTION

In a bankruptcy proceeding, John H. Ring, III, the Chapter 7 trustee ("Ring" or "Trustee"), moved to assume a pre-bankruptcy contract between Debtor Theodore Liaros and Defendant-Appellee Ted's Jumbo Red Hots, Inc. ("Ted's"). At stake was $100,000 that Ring argued Ted's was obliged to pay Liaros pursuant to the contract. Because the Bankruptcy Court (Hon. Michael A. Kaplan) properly found that the agreement was not assumable, this Court will affirm the decision of the Bankruptcy Court.

## II. BACKGROUND

Theodore Spiro Liaros was vice president and shareholder of Ted's Jumbo Red Hots, a hot dog business founded in 1927 by his grandfather, from approximately 1990 to 2010. (Appellant's Statement of Material Facts, Docket No. 5-1 at p. 84; Docket No. 7 at p. 17.) In 2010, Liaros's employment with Ted's was terminated and Liaros's sister, Thecly Ortolani, became the president of Ted's. (Docket No. 5-1 at p. 85.) In May 2011, Liaros opened a restaurant called Theodore's Original Charcoal-Broiled Red Hots, Inc. (Id.) The family conflict surrounding these events was the subject of an article in the July-August 2011 edition of the local magazine *Buffalo Spree*. (Docket No. 7-1 at pp. 17-28.)

1

On May 16, 2013, Liaros entered into a contract with Ted's to sell his Ted's shares to Ted's for $1.5 million. ("The Agreement," Docket No. 5-1 at pp. 7-19.) Sections 1-6 of the Agreement contained representations regarding the purchase of the stock, warranties, conditions for closing, and details of the closing. Section 7 of the Agreement contained restrictions on the parties' conduct. The parties were defined as including Ted's, Thecly Ortolani, and Liaros himself. (Id. at p. 9.) Pursuant to § 7, the parties were restricted from: opening stores within 2 miles of the other party's store; using the food or drink recipes of the other party; infringing on the other party's intellectual property; entering the store locations of the other party; and soliciting the employees of the other party. (Id. at pp. 10-11.) Section 7 also limited the parties' speech. Relevant to the instant action, the parties were not to "disparage, ridicule, or criticize the other party in any respect," or refer to the other in advertising, social media, or newspapers. (Id. at p. 10.) The Agreement specifically made the *Buffalo Spree* article an off-limits topic. (Id. at p. 11.) Liaros was also to discontinue references to the history of Ted's hot dog business and to his grandfather, the founder of Ted's. (Id. at p. 10.)

As "additional consideration for agreeing to the restrictions referred to in Section 7," Section 8 provided that Ted's would pay Liaros $200,000 in four equal installments at the end of December in 2014, 2015, 2016, and 2017. (Docket No 5-1 at pp. 11-12.) Section 8 also contained the following provision: "[t]he Corporation [Ted's] agrees that immaterial or inadvertent instances of non-compliance with the restrictions set forth in Section 7 that are not harmful to the Corporation's business shall not be grounds to withhold payment of all or any portion of such installments." (Id. at p. 12.)

Ted's made payments of $50,000 to Liaros at the end of 2014 and 2015.

2

(Defendant's Supplemental Statement of Material Facts, Docket No. 7-1 at p. 92.) In 2016, Liaros engaged in conduct covered by the Agreement. On April 24, 2016, on the Facebook page of Theodore's, Liaros discussed his tax woes, his ouster from Ted's by his father and sister, and stated, "[i]t is time to set the record straight. I am Ted, the grandson and namesake of the Founder of Ted's Hot Dogs." (Docket No. 7-1 at pp. 45-47.) Readers commented on or "liked" his comments. Readers made comments such as, "after reading your story years ago, we refuse to ever go into Ted's," "hear, hear, I have not and will not EVER eat at Ted's ever again," and "wow, someone in your family is a rotten apple." (Id. at pp. 47-51.) On April 28, 2016, Liaros again posted on Facebook, this time referring to the provisions of the Agreement, discussing his sister's and uncle's conduct, and providing a link to the *Buffalo Spree* article. (Id. at p. 53.) On May 26, June 14, June 15, and June 20, 2016, Liaros again posted on Facebook, discussing family politics and referring to his grandfather, the founder of Ted's. (Docket No. 5-1 at pp. 56, 26-28, 58-61; Docket No. 7-1 at pp. 63-64.)

Attorneys for Ted's sent Liaros a cease-and-desist letter on June 20, 2016, indicating that he had breached parts of § 7 of the Agreement and demanding that he stop posting about topics covered by the Agreement and take down his Facebook posts. (Docket No. 5-1 at pp. 30-31.) On the following day, June 21, 2016, Liaros again posted on Facebook, linking to an image of the cease-and-desist letter, discussing the unfairness of the Agreement, and referring to the conduct of his sister and her "minions." (Docket No. 7-1 at p. 77.)

Ted's did not make the 2016 and 2017 payments to Liaros.

Liaros and his wife, Beth Ann Liaros, filed a voluntary petition for relief under

3

Chapter 7 of the United States Bankruptcy Code on October 6, 2016. (Bankruptcy Docket, Docket No. 1-1 at p. 2.) On December 1, 2017, Ring, the Bankruptcy Trustee, filed a motion pursuant to Section 365 (a) of the Code to assume the Agreement. (Id. at p. 7.) Ring commenced an adversary proceeding against Ted's on March 8, 2019, seeking to recover the $100,000 he claimed was due under § 8 of the Agreement, pursuant to 11 U.S.C. § 542 (b). (Docket No. 6-1 at pp. 5-11.) Ring moved for summary judgment in the Adversary Proceeding on April 2, 2021. (Bankr. 1:19-ap-1004, Docket No. 47.) Ted's cross moved for summary judgment on May 3, 2021. (Bankr. 1:19-ap-1004, Docket No. 53.)

On August 6, 2021, the Bankruptcy Court rendered a decision from the bench denying Ring's motion to assume the Agreement, denying Ring's motion and granting Ted's cross-motion for summary judgment in the adversary proceeding, and dismissing Ring's complaint in the adversary proceeding. (Docket No. 5-1 at pp. 171-76; see also Order of August 6, 2021, id. at pp. 163-64.) Ring appeals the denial of his motion for summary judgment and the dismissal of his complaint in a separate proceeding before this Court. (See 1:19-CV-955S.) In the instant appeal, Ring challenges the Bankruptcy Court's denial of his motion to assume the Agreement. (Docket No. 5.)

### III.  DISCUSSION

In this appeal, Ring argues that the Bankruptcy Court wrongly denied his motion to assume the Agreement pursuant to 11 U.S.C. § 365 (a).

**A.    Legal Standards**

**1.  Standard of Review**

United States District Courts have jurisdiction to hear appeals from "final

4

judgments, orders, and decrees" of bankruptcy courts. 28 U.S.C. § 158 (a). A district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Heilbron v. Plaza, No. 20-CV-00312 (CBA), 2021 WL 1062034, at *2 (E.D.N.Y. Mar. 19, 2021) (quoting Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.), 468 B.R. 603, 611 (S.D.N.Y. 2012) (quoting former Fed. R. Bankr. P. 8013)). See also W. Milford Shopping Plaza, LLC v. Great Atl. & Pac. Tea Co., Inc. (In re Great Atl. & Pac. Tea Co., Inc.), No. 14-cv-4170 (NSR), 2015 WL 6395967, at *2 n. 1 (S.D.N.Y. Oct. 21, 2015) (noting that, although the Federal Rules of Bankruptcy Procedure were amended to remove Rule 8013, the appellate powers of the District Court with respect to bankruptcy appeals have remained the same)).

The district court must accept a bankruptcy court's findings of fact unless they are clearly erroneous, but it reviews the bankruptcy court's legal conclusions *de novo*. Ball v. A.O. Smith Corp., 451 F.3d 66, 69 (2d Cir. 2006). "In reviewing the bankruptcy court's decision, a district court need not agree with every conclusion reached and 'may affirm that decision on any ground supported in the record.'" In re Bodine, 190 B.R. 759, 762 (S.D.N.Y. 1995) (quoting In re Coronet Cap. Co., No. 94 Civ. 1187 (LAP), 1995 WL 429494, at *2 (S.D.N.Y. July 20, 1995) (citing Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1359 (2d Cir. 1993), cert. denied, 510 U.S. 945, 114 S. Ct. 385, 126 L. Ed. 2d 333 (1993))

**2. Executory Contracts**

Section 365 (a) of the Bankruptcy Code provides that a "trustee, subject to the court's approval, may assume or reject any executory contract." 11 U.S.C. § 365 (a). The Second Circuit has not conclusively defined what makes a contract executory, but courts in this district have used three tests to answer this question.

The most demanding test, the Countryman approach, defines an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." In re Bradlees Stores, Inc., No. 00-16033 (BRL), 2001 WL 1112308, at *6 (S.D.N.Y. Sept. 20, 2001) (citing Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973)). Under this test, a contract will be deemed executory only if "material future performance obligations remain on both sides" of the contract. Id. (citing In re Bluman, 125 B.R. 359, 361–62 (Bankr. E.D.N.Y.1991).

Under the "functional approach," a court "looks to whether assumption or rejection of the contract in question would benefit the debtor's estate, regardless of whether any material obligations remain outstanding on the part of only one party to the contract." In re WorldCom, Inc., 343 B.R. 486, 493 (Bankr. S.D.N.Y. 2006) (citing In re Bradlees, 2001 WL 1112308, at *6).

Finally, the "some performance due" test defines an executory contract as one "on which performance remains due to some extent on both sides." In re NanoDynamics, Inc., 735 F. App'x 762, 764 (2d Cir. 2018) (citing E. Air Lines, Inc. v. Ins. Co. of Penn. 85 F.3d 992, 998-99 (2d Cir. 1996)).

Regardless of the test used, courts generally examine the executory status of a contract as of the date the bankruptcy petition was filed. NanoDynamics, 735 F. App'x at 764.

### 3. Assumption of Executory Contracts

Section 365 (a) of the Bankruptcy Code permits a trustee to assume or reject any

of the debtor's executory contracts or leases, but only under certain conditions. For a trustee to assume an executory contract where the debtor has defaulted in performance, the trustee must first cure the default or provide assurances that the trustee will promptly cure it. 11 U.S.C. § 365 (b)(1)(A).

**B.     The Agreement is not executory.**

Although the parties argue vigorously about whether the Agreement was executory, a review of the record shows that this issue was not in dispute before Judge Kaplan. It appears that Judge Kaplan assumed without explicitly holding that the contract was executory and proceeded to assess whether it could be assumed.

Having examined the Agreement, the record on appeal, and the briefing in this matter, this Court finds as an additional basis for affirming the Bankruptcy Court that the Agreement was not executory. See In re Bodine, 190 B.R. at 762 (The Court "may affirm [a Bankruptcy Court decision] on any ground supported in the record.'").

This Court bases its finding on the principle that where the only outstanding contractual obligations are those arising under a restrictive covenant, and where the covenant was not "material" to the contract—that is, where a breach of it would not "substantially defeat[] the purpose of the contract," Seitz v. Paul T. Freund Corp., No. 07-CV-6067L, 2009 WL 1011617, at *2 (W.D.N.Y. Apr. 15, 2009)—a contract will not be found to be executory under the Countryman test. See, e.g., In re Schneeweiss, 233 B.R. 28, 31 (Bankr. N.D.N.Y. 1998) ("An obligation to comply with a restrictive covenant such as a covenant not to compete, does not constitute a material obligation, and a contract under which one party must refrain from competing is therefore not executory under the Countryman definition of an executory contract."); In re Spectrum Info. Techs., Inc., 190

B.R. 741, 748 (Bankr. E.D.N.Y. 1996) (holding that an obligation not to compete with former employer pursuant to a noncompete covenant "does not constitute a material obligation, and a contract under which one party must refrain from competing is therefore not executory under the Countryman definition of an executory contract"); In re Bluman, 125 B.R. 359, 363 (Bankr. E.D.N.Y. 1991) ("[T]he Contract is no longer executory. It is one for the sale of a business. Its primary objective was accomplished when the Debtor turned over title to the assets. Although the Debtor is currently obligated to abide by the terms of a covenant not to compete, the restrictive covenant is ancillary to the bargained-for agreement to convey the business.").

Here, the purpose of the Agreement was to transfer Liaros's stock in exchange for a sum of $1.5 million. No one argues that this exchange did not take place. The nondisparagement clause and other restrictions in §7 are ancillary to that agreement. Even if any obligations remained under §7 (which, as will be discussed below, this Court does not find), they would not render the contract executory under the Countryman test.

Ring argues that this Court should follow the holding in In re Worldcom. 343 B.R. 486 (Bankr. S.D.N.Y. 2006) In Worldcom, the bankruptcy court found executory a settlement agreement in which debtor agreed not to challenge a consent judgment in return for payment from the condemnation action underlying that consent judgment. The Bankruptcy Court found that the requirement that claimant refrain from taking steps to vacate the consent judgment "clearly goes to the heart of the settlement of the State Action, and is therefore a material outstanding obligation under the Amended Settlement Agreement. It was the specific commitment on the part of [the debtor] that was 'bargained for' in exchange for MCI's commitment to, among other things, maximize recovery in the

Condemnation Action and deliver the Proceeds of up to $1.6 million to [debtor]." In re WorldCom, Inc., 343 B.R. at 494–95. In other words, the court found that the promise of the claimant not to challenge the consent judgment was the reason for forming the contract. Here, in contrast, the Agreement was primarily formed to transfer stock from Liaros to Ted's. The promise to stay silent, and the payments of $50,000, do not go to the heart of the Agreement. Worldcom is therefore inapplicable in this case.

Nor does the Agreement meet the functional test or the "some performance due" test. As discussed below (and in the companion decision at 1:21-CV-955), Liaros's public comments constitute the failure of a condition precedent that relieved Ted's of its obligations to make further payments. See JLM Couture, Inc. v. Gutman, No. 21-870, 2022 WL 211017, at *11 (2d Cir. Jan. 25, 2022) (holding that failure to fulfil condition precedent to payment—faithful performance—relieved other party of duty to pay) (citing Restatement (Second) of Contracts § 225(1) ("Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.")). Pursuant to New York contract law, no money is owed to Liaros, and assumption of the Agreement would therefore not benefit the estate. For the same reasons, this Court finds that no performance remains due on either side of the Agreement.

**C.     Judge Kaplan was correct in denying Appellant's motion to assume the Agreement.**

Even assuming that the Agreement was executory, the Bankruptcy Court was correct to deny Ring's motion to assume it.

In its oral decision, the Bankruptcy Court stated: "[u]nder Section 365, one cannot be compelled to perform a contract that the debtor has materially breached unless the

breach is cured, and cure is not possible here." (Docket No. 6-1 at p. 5.)  As an initial matter, because this Court finds that the Agreement is not an executory contract, this analysis is merely hypothetical.  But even if the Agreement were executory, and some performance remained due to Liaros because § 8 applied to him, the Trustee could not assume it because there is no way that Ring could cure Liaros's default.

A default precludes assumption of an executory contract under § 365 if it is both incurable and "material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange." In re Joshua Slocum Ltd., 922 F.2d 1081, 1092 (3d Cir. 1990). Ring argues that Liaros's statements were not "material" breaches because they did not cause harm to the business. This Court agrees that his statements did not constitute a "material breach," but for a different reason: it finds that § 7 represents an ancillary covenant to remain silent. A violation of its terms would not constitute a "material breach" of the Agreement.

But even though this Court agrees with Ring that the breach was not "material," it finds that the Agreement may not be assumed because the breach is incurable. Ring sidesteps the question of curability, focusing on the issue of materiality. Ring's entire argument is that there is no default, because Liaros's statements fell within the protection of § 8. But, as this Court discusses at length in the companion decision, his statements were not protected.[1]

Ring offers no suggestions how he might cure the situation created when Liaros

---

[1] In its decision of Ring's other appeal, 1:21-CV-955, this Court affirmed Judge Kaplan's finding that Liaros's public statements were neither "immaterial" nor "inadvertent" as required by § 8 of the Agreement. Based on principles of contract construction and standard English usage, this Court agreed with Judge Kaplan that no inquiry into whether Liaros's comments harmed Ted's business was required and that Liaros's statements were not covered by § 8.

made comments on the topics prohibited by § 7 of the Agreement. Eleven U.S.C. § 365(b)(1) explicitly requires that a default be cured before a trustee can assume an executory contract on which the debtor has defaulted. Even assuming, *arguendo*, that the Agreement were an executory contract, this Court would find that the breach is not curable and the Agreement therefore cannot be assumed.

This Court bases its holding that the Agreement cannot be assumed on the fact that it is not an executory contract. Although the Bankruptcy Court denied Ring's motion to assume for a different reason—that Liaros's default was not curable—this Court nevertheless upholds the Bankruptcy Court's denial of Ring's motion to assume the Agreement because it is supported by the record.

## IV.  CONCLUSION

For the foregoing reasons, this Court affirms the Order of the Bankruptcy Court.

## V.  ORDERS

IT HEREBY IS ORDERED, that the Order of the Bankruptcy Court, Western District of New York (1:16-bk-11951, Docket No. 164), is AFFIRMED.

FURTHER, that the Appeal (Docket No. 1) is DENIED and DISMISSED.

FURTHER, that the Clerk of Court is DIRECTED to close this case.

SO ORDERED.

Dated:   February 15, 2022
         Buffalo, New York

                                       s/William M. Skretny
                                       WILLIAM M. SKRETNY
                                       United States District Judge